UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD JAY DUPUIS II,　　　　　　　　Case No. 21-cv-

       Plaintiff,

vs.

CITY OF HIGHLAND PARK and
HUBERT YOPP, individually and
in his official capacity, and jointly
and severally,

       Defendants.
_____
GARY T. MIOTKE (P41813)
Attorney for Plaintiff
6828 Park Avenue
Allen Park, MI 48101
(313)-388-4809
gmiotke@miotkelawoffice.com

_____

COMPLAINT AND DEMAND FOR JURY TRIAL

    NOW COMES the Plaintiff, by and through his attorney, and for his

Complaint he states that:

JURISDICTION, PARTIES, VENUE

    1. This action arises out of the Plaintiff's employment.

1

2. Count I is an action to enforce civil rights pursuant to 42 USC 1983. This Court has jurisdiction over Count I pursuant to 28 USC 1331 and 28 USC 1343(a)(3) and (4).

3. This Court has jurisdiction over Count II by virtue of the doctrine of supplemental jurisdiction, 28 USC 1367.

4. Plaintiff is a resident of the City of Flat Rock, County of Wayne, State of Michigan.

5. Defendant, City of Highland Park ("City") is a Michigan municipal corporation that exists by virtue of the laws of the State of Michigan within the Eastern District of Michigan, Southern Division.

6. Defendant, Hubert Yopp ("Yopp") is a resident of the City and has been the City's Mayor for all times material to this complaint.

7. The events giving rise to this case arose within the Eastern District of Michigan.

## BACKGROUND FACTS

8. For all times material to this Complaint, Plaintiff had been employed by the City.

9. Plaintiff started his employment with the City approximately 14 years ago as a Patrol Officer employed in City's Police Department.

10. Over time, Plaintiff was promoted to the position of Sergeant.

11. On or about January 14, 2018, Plaintiff was on-duty acting in his capacity as a Sergeant and as the shift supervisor for the City's Police Department.

12. On said date, at least three of Plaintiff's subordinates were involved in an encounter with the driver of a Chevy Tahoe.

13. The driver of the Chevy Tahoe was Gregory Yopp, a son of Yopp ("Yopp's son").

14. Yopp's son appeared to have engaged in at least of the following crimes or offenses: Operating While Intoxicated, child neglect or endangerment, violation of the Controlled Substances Act, Driving while License Suspended, possession of prescription medication outside of the prescription container in which they were dispensed, and No Proof of Insurance.

15. Upon learning of Yopp's son's identity, one of the Plaintiff's subordinates contacted Plaintiff and briefed Plaintiff on the situation.

16. Plaintiff advised this subordinate to arrest Yopp's son and to transport him to the City's Police Department.

17. Yopp's son was arrested and transported to the City's Police Department.

18. After Yopp's son refused to submit to a chemical test for his blood, after Plaintiff advised him of his chemical test rights, Plaintiff ordered that Yopp's son's blood was to be drawn.

19. Plaintiff also contacted District Judge Officer, apprised her of the situation, and also reported the need for a warrant authorizing the drawing of blood from Yopp's son.

20. District Judge Officer was also advised that the Plaintiff would dispatch a patrol officer to swear an affidavit in support of the request for a search warrant for Yopp's son's blood.

21. District Judge Officer signed the search warrant and Yopp's son was transported to Henry Ford Hospital for a blood draw.

22. Yopp's son's blood was drawn and the blood kit was then packaged and sealed for delivery.

23. Plaintiff entered the refusal of Yopp's son to submit to the chemical test into the Law Enforcement Information Network ("LEIN").

24. Plaintiff sent information related to Yopp's son's crimes and offenses to the City's Detective Bureau to be forwarded to the Wayne County Prosecutor's Office.

25. Plaintiff directed the City's Police Department to request a warrant against Yopp's son for the following charges: child endangerment, operating a motor vehicle under the influence of drugs, violation of the controlled substances act (possession of a controlled substance), driving while license suspended, and no proof of insurance.

26. Yopp arrived at the station of the City's Police Department and requested to see his son who was still in custody.

27. Yopp informed Plaintiff that he was aware of the fact that Plaintiff had arranged for a search warrant related to the blood of Yopp's son.

28. Plaintiff allowed Yopp to see his son and at Yopp's request allowed Yopp to take his son home.

29. Also on January 14, 2018, Plaintiff spoke with City's Police Chief ("Chief Logan"), advised him that the investigation should be turned over to the Michigan State Police ("MSP"), and advised him that he feared retaliation from Yopp.

30. Chief Logan ordered Plaintiff <u>not</u> to contact the MSP.

31. On or about April 5, 2018, the Plaintiff was suspended from active duty in retaliation for his having reported violations or suspected violations of the law to at least one public body as alluded to at paragraphs 16, 19, 20, 23, 24, 25, and 29.

32. Due to this retaliatory suspension, Plaintiff filed a lawsuit in the Wayne County Circuit Court based on the City's violation of the Michigan Whistleblowers' Protection Act ("WPA") where it was assigned Case Number 18-005616-CL ("First Lawsuit").

33. The First Lawsuit was protected activity under the WPA and under the 1st Amendment as speech and petitioning government for the redress of grievances on a matter of public concern.

34. On October 7, 2020, Plaintiff sent an email to the Police Chief ("Chief Coney") and the Deputy Police Chief ("D/C Holcomb") of the City's Police Department.

35. At and prior to the time that Plaintiff did so, and for all the times material to this Complaint thereafter, Plaintiff was the duly elected President of the Command Officers Union, the union for full-time police supervisors employed by the City's Police Department ("Union").

36. Plaintiff sent his email in his capacity as the Union's President as 1st Amendment protected speech and association on a matter of public concern, namely that the noise from the network rack near the Supervisor's desk may be a MIOSHA violation.

37. On October 22, 2020, an individual employed by the City in Internal Affairs and I.T. sent Yopp an email saying that he received an anonymous complaint about Plaintiff "dry firing" (i.e. practicing firing with an unloaded weapon).

38. On October 23, 2020, Chief Coney sent Plaintiff an email asking about the allegation that Plaintiff had been dry firing.

39. On November 27, 2020, Plaintiff responded to Chief Coney with an email wherein he stated, among other things, the following: "As far as dry firing, I do not recall dry firing, but it's certainly possible. Since the Department has knowingly and willfully failed to comply with MCOLES Active Duty Firearm Standard, I try to dry fire regularly."

40. Also, on November 27, 2020, Plaintiff posted both Chief Coney's email and Plaintiff's response on the Union board as the Union's President.

41. In doing so, and then later posting other communications on the Union board, Plaintiff engaged in 1st Amendment protected speech and association on a matter of public concern where he was commenting as the Union's President on a matter of public concern and sharing these communications with Union members and other persons.

42. On December 7, 2020, Chief Coney ordered Plaintiff to explain why Plaintiff posted the email and Plaintiff's response on the Union board. Plaintiff later posted this communication.

43. On December 7, 2020, Plaintiff sent Chief Coney an email responding to this order which Plaintiff also later posted.

44. In his response, and among other things, Plaintiff explained that:

(a) He posted on the Union board to communicate with his Union members.

(b) He wanted them to know that the administration seems more concerned about Plaintiff dry firing than about (i) providing critical training in such areas as firearms, defensive tactics, legal updates, or even tactical driving and/or (ii) paying gun allowances and signing bonuses.

(c) He felt that everything he did was under scrutiny due to his actions as Union President and/or the First Lawsuit.

45. On December 11, 2020, Plaintiff received a call from Chief Coney and D.C. Holcomb wherein they told Plaintiff that he was suspended without pay.

46. On December 16, 2020, Chief Coney put out a department email stating that Plaintiff has been suspended and that Officers should govern themselves accordingly.

47. On December 17, 2020, Plaintiff received department charges.

48. On December 21, 2021, Chief Coney, D/C Holcomb, and City Attorney Terry Ford ("Ford") had a meeting.

49. During the meeting, Ford stated that Plaintiff should be fired and that Plaintiff's posting of the emails on the Union board was "disrespectful".

50. On January 8, 2021, a Chief's hearing was held.

51. Among other things, Chief Coney admitted during this meeting that Plaintiff's posting of the emails on the Union board was a reason for the actions being taken against Plaintiff.

52. On January 15, 2021, the Chief's hearing concluded with the Plaintiff being told that he would receive a decision within 7 days.

53. Instead, on or about February 10, 2021, Yopp issued a letter terminating Plaintiff's employment.

54. Plaintiff did not receive this letter until February 20, 2021.

55. Plaintiff's speech, statements, communications, associations, petitioning for the redress of grievances, and/or other actions as noted above were on or related to matters of a public concern.

56. Moreover, by virtue of some of the same speech, statements, communications, associations, petitioning for the redress of grievances, and/or

actions, the Plaintiff did report violations or suspected violations of law to a public body or public bodies.

57. The Defendants, and each of them, subjected the Plaintiff to adverse employment actions, retaliation, and discrimination, including, but not necessarily limited to, the following:

(a) An indefinite suspension without pay; and

(b) Termination of the Plaintiff's employment.

58. The Defendants subjected the Plaintiff to the above adverse employment actions in significant part due to the Plaintiff's above speech, statements, communications, associations, petitions (including the First Lawsuit), and/or actions that were on or related to matters of a public concern and/or that were reports of violations or suspected violations of law to a public body or public bodies.

59. Therefore, the adverse employment actions taken against the Plaintiff by the Defendants were contrary to the United States Constitution and the laws of the United States of America and the State of Michigan.

<u>COUNT I: DEPRIVATION OF THE PLAINTIFF'S FEDERAL CONSTITUTIONAL AND CIVIL RIGHTS AS TO ALL DEFENDANTS</u>

60. The Plaintiff incorporates paragraphs 1 through 59 above by reference.

61. This Count is brought pursuant to 42 USC 1983.

62. The adverse actions taken by the Defendants against the Plaintiff as noted above were taken under color of state law.

63. The adverse actions stemmed from purposeful discrimination, purposeful retaliation, and/or from the City's policy(ies) and/or custom(s). This includes, but is not necessarily limited to, actions taken by the individual Defendant as the City's final policymaker for purposes of establishing the City's policy(ies) and/or custom(s).

64. The adverse actions violated the Plaintiff's 1st Amendment rights to freedom of association, to freedom of speech and/or expression, and/or to petition government for the redress of grievances in that they were made in significant part due to the Plaintiff's statements, actions, and/or activities that were protected under the 1st Amendment.

65. As a direct and proximate result of the Defendants' violations of the Plaintiff's rights, Plaintiff has sustained damages including (but not necessarily limited to) the following:

    (a) Loss of income;

    (b) Loss of fringe benefits;

    (c) Loss of pension and/or Social Security benefits;

    (d) Severe mental anguish and distress;

    (e) Embarrassment and humiliation;

    (f) Mental anguish stemming from the outrage he experienced as a result of the actions against him;

    (g) Fright, shock, and mortification;

    (h) Pain and suffering;

    (i) Damage to reputation;

    (j) Liquidated damages;

    (k) Punitive damages; and

    (l) Costs and attorney fees.

WHEREFORE, your Plaintiff respectfully requests this Honorable Court to enter a judgment in his favor against the Defendants, jointly and severally, awarding him an amount in excess of One Million ($1,000,000.00) Dollars to which he is entitled for compensatory, exemplary, liquidated, and punitive damages; granting him equitable relief (including expungement of false information from his personnel record); and awarding him costs, interest, and attorney fees so wrongfully incurred.

### COUNT II: VIOLATION OF RIGHTS UNDER THE WHISTLEBLOWERS' PROTECTION ACT AS TO ALL DEFENDANTS

66. The Plaintiff incorporates paragraphs 1 through 65 above by reference.

67. Under the Whistleblowers' Protection Act ("WPA"), the Defendants

were and/or are "employers" for all times material to this Complaint.

68. Under the WPA, each Defendant was also a "public body" for all times material to this Complaint.

69. Under the WPA, the Plaintiff was an "employee" for all times material to this Complaint.

70. The adverse actions taken by the Defendants against the Plaintiff as noted above were taken in significant part due to the Plaintiff's report(s) of violations or suspected violations of the law to at least one public body.

71. The Defendants thus violated the WPA.

72. As a direct and proximate result of the Defendants' violations of the Plaintiff's rights, Plaintiff has sustained damages including (but not necessarily limited to) the following:

    (a) Loss of income;

    (b) Loss of fringe benefits;

    (c) Loss of pension and/or Social Security benefits;

    (d) Severe mental anguish and distress;

    (e) Embarrassment and humiliation;

    (f) Mental anguish stemming from the outrage he experienced as a result of the actions against him;

(g)  Fright, shock, and mortification;

(h)  Pain and suffering;

(i)  Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages; and

(l)  Costs and attorney fees.

WHEREFORE, your Plaintiff respectfully requests this Honorable Court to enter a judgment in his favor against the Defendants, jointly and severally, awarding him an amount in excess of One Million ($1,000,000.00) Dollars to which he is entitled for compensatory, exemplary, liquidated, and punitive damages; granting him equitable relief (including expungement of false information from his personnel record); and awarding him costs, interest, and attorney fees so wrongfully incurred.

DEMAND FOR TRIAL BY JURY IS HEREBY MADE.

DATED: May 5, 2021              /s/ GARY T. MIOTKE_____
                                GARY T. MIOTKE (P41813)
                                Attorney for Plaintiff